### SENECA NATION OF INDIANS v. JOHN.

*(Supreme Court, Special Term, Erie County. July, 1891.)*

1. SENECA INDIANS—TITLE TO OFFICE—CONTEST.

The constituting of the Seneca Nation of Indians into a distinct community, (2 Rev. St. N. Y., 6th Ed., p. 1051, § 84,) and the recognition of the government formed by them, by the state and the United States, was sufficient to organize them into a public corporation, within Code Civil Proc. § 1948, subd. 1, providing for an action instituted by the attorney general where a person unlawfully holds within the state a franchise or public office, or an office in a domestic corporation.

2. SAME—DE FACTO OFFICER—COLLATERAL ATTACK.

Where a candidate for president of the Seneca Nation has been declared elected by the board of canvassers, and a certificate has issued, and he has entered on the discharge of the duties of his office, he is a *de facto* officer, and his title to the office cannot be tried on a motion to vacate an injunction restraining his predecessor in office from assuming to act as president.

3. SAME—USURPATION OF OFFICE—INJUNCTION.

The Seneca Nation, as a public corporation, may maintain an injunction to restrain the usurpation of official authority.

4. SAME—SECURITY.

An action by the Seneca Nation to restrain usurpation of office is within Code Civil Proc. N. Y. § 1900, dispensing with security in an action brought by a municipal corporation.

Action by the Seneca Nation of Indians against Andrew John, Jr., to restrain him from assuming to act as president of the nation. Injunction was granted, and defendant moves to vacate it.

*Hudson Ansley,* for plaintiff. *Leroy Andrus,* for defendant.

DANIELS, J. The motion is made to vacate an injunction. This injunction restrains and enjoins the defendant from assuming to act as the president of the Seneca Nation of Indians, and from discharging the duties pertaining to that office. He was elected to the office of president in May, 1890, and under that election held the office for the period of one year, when, according to the papers which have been produced on the hearing of the motion, his term of office expired. Prior to the expiration of that term, and in May, 1891, an election was again held for the office of president of the nation, as well as that of other officers, for the ensuing year; and, at the close of the election, the board of canvassers, after canvassing the votes, declared Thomas Kennedy to have been elected to the office of president of the nation. Of this board the defendant is stated to have been a member, and that as the result of the canvass it was unanimously declared that Thomas Kennedy had been elected to the office of president. But, when it became necessary to certify the fact, the defendant declined to join in the certificate, alleging as the ground of his refusal that Kennedy had been convicted of a felony, consisting of an assault in the second degree, and for that reason, under the constitution of the nation, was ineligible to the office of president; and, to sustain the application to vacate the injunction, the fact has been proved that such a conviction did take place. And it has been claimed on behalf of the defendant that Kennedy for that reason was ineligible to the office, and that the defendant held over under the election of the preceding year. This position has been taken under what is referred to as section 9 of the constitution adopted for the government of the nation; and, as that is contained in the moving papers, it has declared that every Indian of the Seneca Nation of the age of 21 years and upwards, residing upon either of its reservations, who

should not have been convicted of a felony, shall be eligible to any office in the gift of the people of the nation.    But on behalf of the plaintiff this objection has been answered by the statement, which is not contradicted in the case, that the constitution containing this provision was adopted in 1868, and had never been ratified by the legislature of the state, or by the congress of the United States; and that the nation had in fact continued to be governed under a constitution adopted in March, 1862, which had been ratified and approved by the legislature of the state of New York, and contained no such provision concerning the ineligibility of a candidate for the office of president. And it appears by chapter 124, Laws 1865, that the legislature declared the constitution of 1862 to be the legitimate government of the Seneca Nation; and as that appears to have contained no such restriction as the constitution of 1868 upon this subject, and this constitution was not ratified or approved, it is to be inferred that no provision was in force rendering Kennedy ineligible to the office of president on account of this conviction.

But it further appears, in contradiction of the affirmation contained in the affidavit of the defendant, that after Kennedy was declared by the board of canvassers to be elected to the office of president, and a certificate of that fact was made by the board of canvassers, that he entered upon the discharge of the duties of that office.    This is stated in the complaint of the plaintiff, wherein it is alleged that Kennedy "duly qualified as such president, and entered upon the discharge of his duties as such, and has been, and for and during all the time, and now is, exercising and performing the duties of his office to the best of his ability."    This complaint was sworn to by William C. Hoag, who is the treasurer of the nation.    And this averment is direct and positive, and by the affidavit verifying the complaint is attested as true to the knowledge of this affiant.    Kennedy himself also, in his own affidavit made to oppose the motion, has stated the same fact, that the votes were canvassed, that a certificate of his election was made by the canvassing board, and immediately thereafter he duly qualified, and since then has been acting as president of this nation.    And these affidavits are sufficient to overcome the general statement in that made by the defendant, in which he denied that Kennedy was acting as president of the Seneca Nation.    It is not, however, from the form of the defendant's affidavit, to be inferred that he intended to deny the fact that Kennedy had entered upon the discharge of his duties and the exercise of his authority as president of the Seneca Nation otherwise than on account of his ineligibility under the section of the constitution of 1868, which has already been referred to.    And being in this manner in the office of president of the nation, and engaged in the discharge of its duties and the exercise of its authority, the defendant was not in a position to contest that authority by attempting to resume it on his own part, and in combination with others claiming to be the lawful president of the nation.    The right or title to the office could not be determined in this manner.    For even though Kennedy might be ineligible to the office by reason of the fact alleged against him, he was still in its possession under color of an election, in which it appears that he received a majority of the votes which were cast, and he was declared elected upon a canvass of those votes, and a certificate to that effect made by the canvassers; and, after entering upon the duties of the office under that apparent legal authority, his right to it could not be set aside or defeated by any attempt on the part of the defendant to resume the authority of the office. Kennedy thereby became, even though he might have been ineligible, what is known as the "*de facto* president" of the nation; and, while he held the office under that authority, his title could only be denied and overthrown by a direct proceeding brought for that purpose in an action to try the right to the office.

In the case of *Lambert* v. *People*, 76 N. Y. 220, an oath had been taken before a notary, who was a resident of the state of New Jersey, and for that

reason ineligible to the office under the laws of this state, and it was proposed to prove that fact for the purpose of establishing the position that the affidavit had been illegally sworn to. But the court held that the officer was still in the possession of the office under color of his appointment, and that his official act could not be nullified by evidence of this description. On this subject it was said that "the effect of the testimony offered would have been to assail the authority of the officer who administered the oath. The rule is well settled that the acts of an officer *de facto* are valid, as respects the public and the rights of third persons, and it is not allowable to assail the title of such officer in a collateral proceeding." Id. 231. The same rule was applied to the position of the commissioner of jurors in *Dolan* v. *People*, 64 N. Y. 485. The objection was taken that he was illegally in the office, and for that reason was vested with no authority to draw the jury. But the court held that "a jury drawn by a *de facto* commissioner would be as regular as one drawn by a *de jure* commissioner." Id. 495. And the principle is one of general application, where a person has entered upon the discharge of the duties of his office under color of an election or appointment, that the title to the office can only be questioned in an action brought for that object and to secure his removal. In *Hall* v. *Luther*, 13 Wend. 491, where the office of sheriff was brought in question, it was said by the court that "he was sheriff *de facto*, and his title to his office could not be inquired into collaterally. A proceeding in *quo warranto* should be instituted." Id. 494. And this was generally affirmed in *People* v. *White*, 24 Wend. 520, which, in the reversal afterwards directed by the court of errors, left this principle undenied and unassailed. And that is that, "where there is color of lawful title, the officer must be obeyed and his acts respected until judgment of ouster is pronounced against him in the proper proceeding for that purpose." Id. 526. The right of a constable to execute process was denied in *People.* v. *Hopson*, 1 Denio, 575, on account of his having omitted to take the oath of office prescribed by law. But in overruling the objection it was added by the court that "it is equally well settled that the acts of an officer *de facto*, though his title may be bad, are valid, so far as they concern the public, or the rights of third persons who have an interest in the things done. Society could hardly exist without such a rule." Id. 579. And it was said generally in *Demarest* v. *Wickham*, 63 N. Y. 320, concerning the election of certain persons as aldermen, that "their election, followed by their assumption of the office, constituted them officers *de facto*, but not *de jure*. The remedy which the law gives against them is a proceeding, by information, in the nature of a *quo warranto*, issued by the attorney general in the name of the people of the state, to remove them as intruders into the office claimed by them. They are not made parties in this action, and it is not brought in the name of the people of the state." Id. 323. And so it was also generally held in *Mayor*, *etc.*, v. *Tucker*, 1 Daly, 107, and *People* v. *Jones*, 17 Wend. 81, 84.

To contest the title of Kennedy to this office of president, the law has prescribed an effectual remedy; and that is by an action instituted by the attorney general, which may be taken where a person usurps, intrudes into, or unlawfully holds or exercises, within the state, a franchise or public office, civil or military, or an office in a domestic corporation. Code Civil Proc. § 1948, subd. 1. And that is sufficiently broad to include this action; for by the statute of the state these Indians were constituted a distinct community in and by the name of the "Seneca Nation of Indians." 2 Rev. St. (6th Ed.) p. 1051, § 84. And as such, in the year 1849, they were recognized by the legislature of the state of New York. At that time they had met in convention, and formed a government for themselves, founded on popular elections, and had adopted a constitution to that effect. This was recognized by the government of the United States, and the government of this state accepted and acknowledged it in its dealings with these Indians. Id. p. 1060, § 125. And since that

time, under like authority, they have proceeded to modify their system of government, and to make such changes as in their judgment appeared to be adapted to their condition and situation. And in this respect a generous and enlightened policy towards these Indians has been observed on the part of the government of the United States, as well as of the state of New York.

This action was sufficient to organize these Indians into a public corporation, securing to them the election of their officers and the perpetuation of their government, and entitling the nation to the protection of actions against usurpers in their offices by a proper proceeding for that purpose instituted by the attorney general; and upon that subject it has been held generally that even offices in a private corporation may be contested, and the title disposed of, by means of an action of this description. *Com.* v. *Arrison,* 15 Serg. & R. 127; *Com.* v. *Union Fire, etc., Co.,* 5 Mass. 231; *State* v. *Buchanan,* Wright, (Ohio,) 233; *People* v. *Tibbetts,* 4 Cow. 358. If, therefore, Kennedy has illegally entered upon the exercise of the authority of this office and the discharge of its duties, the remedy for that is not by a resumption of the authority by the defendant as the president of the preceding year holding over in his office, but by an action to try the title or right of Kennedy to this office. That is an orderly proceeding, attended with no disturbance whatever of the public affairs of the nation, and at the same time vindicating its authority under its constitution; and that is the only means which the law permits to be resorted to for the purpose of redressing the ground of complaint asserted in behalf of this defendant. Any other proceeding on his part, having the effect of creating a conflict of authority between himself and Kennedy, and the disturbance of the peace and good order of the nation, is illegal, and requires to be prevented; and the nation itself is the proper party, in the first instance, to take measures to prevent this disturbance of the peace and good order of its members.

It has, however, been urged that, inasmuch as the legislature has prescribed certain specified actions which may be brought by the Seneca Nation, it was not intended that an action to restrain the usurpation of official authority should be maintained by the nation. The actions which have been particularly enumerated in this manner are mentioned in 2 Rev. St. (6th Ed.) p. 1051, § 84. But this section contains no language excluding other actions which may be necessary for the vindication or support of the rights or good order of the Seneca Nation. And the legislature has provided, further, by the next section, in defining the duties of the attorney of the Seneca Nation, that "he shall prosecute and maintain all such actions, suits, and proceedings for them, or any of them, as he may find necessary and proper." And it has generally been provided, as one of the inherent rights of a corporation, that it shall have the power to sue and be sued, complain and defend, in any court of law or equity. Id. p. 390, § 1. And even without that authority it was held, as part of the common law, that one of the incidents resulting from the creation of a corporation was the right to sue and be sued, implead and be impleaded, grant and receive, by its corporate name, and do all other acts as natural persons may. Ang. & A. Corp. (10th Ed.) § 110. And inasmuch as this suit had become necessary to maintain and secure the good order of the Seneca Nation, and the administration of the duties of the president, it was regularly instituted under this authority. For in *People* v. *Canal Board,* 55 N. Y. 390, it was held generally that public bodies and public officers may be restrained by injunction from proceeding in violation of law, to the prejudice of the public, or to the injury of individual rights; and a usurpation of powers, it was said, may, by this process, be prevented in a proper case, (Id. 393,) which seems to be ample for all the purposes of this action. And such, also, is the effect of *Reis* v. *Rohde,* 34 Hun, 161. The defendant, consequently, cannot resume the authority of this office, as he has attempted to do, even though Kennedy may, as a matter of fact, prove to be ineligible as its incumbent.

That question cannot be raised or contested in the manner in which it is proposed to be done by the defendant, but may be contested by a proper action brought upon his relation by the attorney general of the state; and that is the only manner in which this contest can regularly be made or brought before the courts for its determination.

The affidavit of the defendant contains many asserted irregularities in the conduct of the election in May, 1891. It is stated that the polls were not opened at the time when that should have been done, but at a later period in the morning; that the election was not held at the meeting-house where it had been declared by the constitution it should be held, and that the officers who acted as inspectors, and the clerk, were not qualified so to act, and that illegal votes were received, and corrupt influences made use of to control the conduct of the electors. But these allegations, together with others affecting the regularity of the election, have been positively denied by affidavits presented on the part of the plaintiff, which seem to be entitled to acceptance as the truth of the case. It is shown by them that all the votes which were offered were in fact received by the inspectors, so that no person was disfranchised by any irregularity in the conduct of the election; and, where that may appear to be the fact, the electors cannot be deprived of the beneficial results of the election by reason of any of these irregularities. It was shown as a fact that the meeting-house where the election was directed to be held had been burned 12 or 15 years preceding the election, and that the election in 1891 was held at the same place where it had been held with the apparent approval and sanction of the nation, during the intermediate period of time. It was also shown that the inspectors adjourned for dinner and for supper, and took the ballot-box with them; that this box was locked, and the key delivered and remained in the possession of another person. And in this respect a greater degree of security was observed than in preceding elections, in which it was stated to be the custom to adjourn for these meals, and take the ballot-box with the inspectors, but without, however, observing the precaution of locking it and delivering the key to another person. It was also denied that illegal votes were given, with possibly one exception of an individual who was related by marriage to the defendant, and not entitled to vote by reason of the fact that he was under 21 years of age. But the statement is made that his vote was not given to Kennedy, and therefore did not affect the result declared in his favor. And so it also appears to be the fact that no illegal votes were received for him which by any possibility could reduce his vote below a majority of those given for the office of president at this election. The object of the law is to secure a fair expression of the legal voters entitled to vote at the election; and, when that may be secured, irregularities of the character complained of in support of this application are not sufficient to deprive the person who receives the majority of the votes of the office to which it is intended on the part of the voters he should be elected. *People* v. *Cook,* 8 N. Y. 67. It is not important to inquire concerning the regularity of the vote that was given for other officers at the election in 1891; for even though they may not have been properly declared elected by the board of canvassers, as is conceded to be the fact concerning one of the candidates, that will not affect the right of the parties to this action. The objections to the undertaking are avoided by section 1900 of the Code of Civil Procedure, dispensing with security in an action brought by a municipal corporation; and this action is sufficiently within the intention, if not within the language, of that section, to justify its application to it. The motion to vacate the injunction must therefore be denied, with costs.